# CHARLESTON.

WARREN AND WIFE *v.* SYME.

March 2, 1874.

1874. January Term.

1. A writing between parties, signed and sealed, by which the owner of a lot and the owners of other adjacent lots, agree that the latter, who sinks a well on the lot of the former, shall have access to it forever, and may use water from it, at all times—the writing not indicating that the parties contemplate any further assurance—is a present grant of the right to use the well.

2. Such a deed, though containing no express declaration that the right granted shall pertain to the adjacent lots, but providing that neither of the grantees shall dispose of the easement, unless at the same time he shall dispose of his lot, by implication, annexes the servitude to the respective lots, as an easement appurtenant to each.

3. Intrinsic certainty, in a deed relative to specific property, is impossible. The description can be made certain only by proof or recognition of the identity of the subject to which it relates, or other objects or things that more or less directly and distinctly indicate and determine it. And, in the application of deeds and other documents to lands and lots, extensive latitude is allowed for the discovery and proof, not only of visible monuments or objects mentioned, but of mathematical lines of other lands and lots, and various classes of facts, to which the description or suggestions in the document may apply.

4. The certainty of a deed is determined by the principles of the common law. The recordation is regulated by the statute alone.

5. Under the law before the year 1819, when a deed was recorded it was as valid and effectual, as to all persons, as if there had been no legislation requiring recordation. But, if, before that time, there had been doubt on the subject, by section four, of chapter ninety-nine, of the Revised Code, adopted in that year, the validity of the deed, when recorded, was plainly declared.

6. Whenever the holder of land made a deed for the conveyance of an estate or the creation of a servitude or easement upon it, that was valid and effectual, as to the alienor, the deed, when duly admitted to record, became alike valid and effectual to pass the estate or create the servitude, as to any subsequent purchaser of the land, from him, for valuable consideration without notice, and as to all other persons.

7. The opinion of the Court of Appeals of Virginia, expressed in the case of *Mundy v. Vawter*, and other cases considered with it, (3 Gratt., 518—see 545,) that a deed executed in 1805, for all the estate, both real and personal of the grantor, because of the want of designation and description of the lands intended to be conveyed, was not notice, in point of law, to a subsequent purchaser from the grantor, of the existence of the deed, but that the proof of notice must be such as to affect the conscience of the purchaser; though in its application to the peculiar circumstances of that case, not questioned, is as a general proposition, disapproved.

8. The clerk of a court, under the supervision of the court, must ascertain the papers filed in a case or referred to in the order book as a part of the record : Though where the papers are identified, whether they may be considered as properly a part of the record, the court alone decides.

9. A recital in a deed, under the bankrupt act of 1841, that a person was, by the United States District Court declared a bankrupt, and that the grantor was assignee and was ordered to sell the property granted, is not evidence of the facts recited, against a person claiming the property otherwise than through or under the grantor.

10. A recital in a deed of partition that a person died, and that the parties to the deed are his heirs, is not evidence of these facts against strangers.

11. Generally, parol evidence, though not excepted to when it is offered or afterwards, is not competent to prove the contents or effect of a deed.

12. Generally, a person can not be disturbed in the possession or enjoyment of property or held responsible for an act done relating to it, by any person not entitled to the property, or its possession or enjoyment.

13. A provision in a deed, creating a servitude upon an estate and annexing it to another estate, as an easement appurtenant to the latter, declaring that the grantee shall not dispose of the easement separately from the property to which it is annexed, is not a restraint upon alienation that is objectionable.

14. A conveyance of property to which an easement is appurtenant, and without which the easement cannot be granted, made by an assignee in bankruptcy, implies the transfer of the easement with the property—Notwithstanding it does not appear that the use of the easement was necessary to the enjoyment of the property, or that at the time of the conveyance the easement was, in fact used with the property.

15. When, by direct proof of a grant, or other sufficient evidence, an easement has been conclusively established, there may be proof of an act or declaration of the owner, indicative of renunciation or abandonment, followed by non-use for a period long enough to bar an action of ejectment to recover the possession of the land; which, when the defendant is not under disability, is ten years; and when he or she is under disability, is twenty years: Or proof of a claim by the owner of the corporeal estate, or another in his stead, known to the owner of the easement, or evinced by acts that, in the exercise of ordinary vigilance he would have learned, followed by non-use by the owner for such period: Or an act or declaration by the owner of the easement, clearly demonstrative of actual abandonment of the easement, that, in fact, promotes some action on the part of another, by which, if the easement were not held to be determined, the latter would be seriously injured: And such proof may conclude the extinguishment of the easement. But nothing less than the one or the other of these combinations of facts, will have such effect. The limited right of a husband in the inheritance of his wife, may, by such acts and declarations, be affected for the time of its duration, as the right of any other person.

16. Section thirty-six of chapter one hundred and twenty-five of the Code, which provides that every material allegation in a bill not controverted by the answer, shall, for the purposes of the suit, be taken as true, does not require a more special denial than was sufficient before its adoption. But, as formerly, the plaintiff, upon proper allegations, may interrogate the defendant, and then he will be required to answer each proper interrogatory. If the defendant does not answer properly, the plaintiff may except to the answer. When, however, he fails to do so, a general denial of the allegations of the bill, will make it necessary that the plaintiff shall prove the facts alleged and so controverted, that are in their nature affirmative.

17. A court of equity, upon a formal hearing, decrees that the defendant remove obstructions to a well which the plaintiff claims the right to use, so as to afford the plaintiff access to the well at all times, unless and until otherwise ordered by the court; and that if the obstruction be not removed within ten days, the sher-

iff, upon application of the plaintiff, shall remove it; and that an injunction previously awarded, inhibiting the defendant from obstructing the plaintiff's using the well till the rights of the claimants could be settled, shall be "continued," and that an account of the expenses of repairing the well be taken: And the court, on a final hearing, dismisses the bill:—the former decree was merely interlocutory; and the dismissal of the bill dissolves the injunction.

1874.<br/>January Term.<br/>Warren<br/>and wife<br/>v.<br/>Syme.

18. When the plaintiff, in a bill alleges sufficient cause for making one person a defendant, but not for making others such, and seeks no relief, takes no decree *nisi*, and proves no right to relief against the latter, who make no defence, and the case being matured as to a proper defendant, the plaintiff acquiesces in a hearing; and the bill is dismissed generally; the plaintiff, upon appeal, has no right on that account, to have the decree reversed.[*]

Appeal by Uriah N. Warren and, Mary Ann, his wife, from a decree of the circuit court of Greenbrier county, dismissing complainant's bill, rendered on the 28th day of April, 1871, in a suit in chancery therein pending, wherein said Warren and wife were complainants and Samuel A. M. Syme, Renick R. Dickson, St. Clair Johnson, Mark L. Spotts and Mrs. Leonard were respondents. The other material facts appear in the opinion of the Court.

The Hon. Henry L. Gillaspie, judge of the thirteenth judicial circuit, presided at the hearing below.

*Price & Sperry*, for the appellants.

*Adam C. Snyder*, for the appellee, Syme.

---

[*] For section thirty-six of chapter one hundred and twenty-five of the Code see *Dickinson v. Railroad Company, infra.* The following is section four of chapter ninety-nine, of the Revised Code of Virginia, of 1819, referred to in the opinion of the Court.

"4. All bargains, sales and other conveyances, whatsoever, of any lands, tenements or hereditaments, whether they be made for passing any estate of freehold or inheritance, or for a term of years, and all deeds of settlement upon marriage wherein either lands, slaves, money or other personal thing shall be settled or covenanted to be left or paid, at the death of the party or otherwise; and all deeds of trust and mortgages whatsoever which shall hereafter be made and executed, shall be void, as to all creditors and subsequent purchasers 'for valuable consideration, without notice,' unless they shall be acknowledged or proved, and 'lodged with the clerk to be' recorded, according to the directions of this act; but the same, as between the parties, and their heirs, 'and as to all subsequent purchasers, with notice thereof, or without valuable consideration,' shall nevertheless be valid and binding."

1874.
January Term.

HOFFMAN, JUDGE:

Warren
and wife
v.
Syme.

In September 1869, William H. Church and Uriah N. Warren and Mary Ann Warren, his wife, exhibited their bill in equity against Samuel A. M. Syme, Renick R. Dickson, St. Clair Johnson, Mark L. Spotts and Mrs. Leonard; in which the plaintiffs allege:

That, in October 1833, an article of agreement was entered into between William S. Littlepage of the first part, and Cyrus Walker, Samuel B. Keenan, Edward Fife, Thomas Welch, Calvin P. Hogshead and George Rapp of the second part, which was duly acknowledged and recorded; in which it was recited, that Littlepage had before agreed that if the other parties would, at their joint expense, sink a well on his lot south of the turnpike, the other parties, as also Littlepage himself, might have free access to the well, themselves, their heirs and and assigns; and in pursuance of the agreement the other parties had dug the well: And then, by the covenant, Littlepage bound himself, his heirs and assigns, to and with the other parties, that they, their heirs and assigns, should then and forever have free access to the well; to to have and to take at all times and upon all occasions water from the well whenever they or their servants might want it, and that no obstruction whatever should be made to them, their heirs, executors, administrators or assigns, going to, procuring water and returning from the well, as they might see fit or necessary: And Littlepage on his part, and the other parties, on their part, promised and agreed that the repairing, preserving and keeping in good order, of the well mentioned, should be borne jointly, between them, and each should bear an equal share of the expenses: And, after the signatures and seals, it was stated that it was understood and agreed between the parties, that no individual of them should sell or dispose of his interest in the well, unless he should, at the same time, sell, dispose of and convey the real estate he then owned and was possessed of, with his right title and interest in the well: And it was further understood

by the parties to the contract, that a direct, free opening being made from the turnpike to the well, by Littlepage, then all progress through his lot in any other way was prohibited; and the way to the well should be that designated, from the turnpike. This deed was acknowledged and admitted to record in the office of the court of the county of Greenbrier, in which the lots were situated.

With the bill, as a part of it, a copy of the deed and certificate of recordation was exhibited.

The plaintiffs allege that all the parties to the contract owned lots adjoining or near each other; that all the original owners sold and conveyed away their respective lots referred to in the agreement; and that—as the plaintiffs maintain—the parties to the contract sold, with their lots, their privilege to use the well; and that it was intended that it should be kept not only for their joint accommodation, but that their respective rights should inure to the benefit of their vendees and assigns forever:

That Church is the owner and occupant of the lot owned at the time of contract by Rapp: That the plaintiff Mrs, Warren, is the owner, through the instrumentality of a trustee, Beard, of the lot then owned by Hogshead; and that Samuel A. M. Syme is the owner of a part of the lot then owned by Littlepage, though not of the part where the well is situated; that the latter part belongs to Mark L. Spotts, who does not object to the use of the water; that Dickson owns the Walker lot, and that Johnson, Spotts and Mrs. Leonard, each, own one of the lots—but what lots, is not stated: That all the original owners have conveyed away their respective lots, and most of the vendees have other sources from which they obtain water, except the plaintiffs and Syme and his tenant:

That the well has hitherto been kept up at joint expense, and is of immense value and importance to the plaintiffs: That recently Syme has locked up the well and forbidden the plaintiff to use the water.

The plaintiffs pray that Syme, Dickson, Johnson, Spotts, and Mrs. Leonard be made defendants, and be required to answer the bill fully ; that Syme be enjoined and inhibited from obstructing or hindering the plaintiffs, their families, or servants, or any of the assignees of the lots, from free use of the water ; and that such order may be made in regard thereto, as will secure them, in future, in their rights before mentioned ; and that they may have such other and further relief as comports with equity.

The bill was sworn to.

In vacation, by a judge of a circuit court, an order was made, that, upon the plaintiffs or some one of them giving bond as required, and injunction be awarded according to the prayer of the bill, till the respective rights of the parties could be considered and adjusted ; and until then, the plaintiffs were declared at liberty to make use of the well and water, as before.

In October, the bill was filed in the circuit court for the county of Greenbrier ; and the bond was given, and a summons, with the injunction endorsed, issued.

Proceedings were had in vacation and in term, that need not be set forth.

In December, 1869, by consent of the parties, it was ordered that the name of Church should be stricken out, and the case proceed in the name of Warren and wife.

The defendant Syme answered the bill, saying :

That he is the owner of the lot now occupied by Mays, and claims the exclusive right to the use of the water in the well, and the title to the land on which it is situated ; that his father, from whom he purchased, has been in the quiet, undisputed, notorious, adverse, and exclusive possession, control and use of the well, under a title, for the past twenty-five years, without ouster or claim of right, title or privilege, from any one, until the last year, when the plaintiffs, after repeated acts of trespass, set up a pretended right to use the water :

The respondent denies that either of the plaintiffs has

any title to the lots which they occupy ; and alleges that the title to the lot occupied by Warren is in Beard, who has not been made a party to the suit : The respondent denies that the part of the lot occupied by the plaintiff's dwelling house ever was owned or occupied by any of the parties to the original agreement : And the respondent denies that the well has been kept up at joint expense, but, on the contrary, he avers that, for the past twenty-five years, his father and himself have, at their own expense, kept the well in repair; and that no one, during that time, ever offered to contribute anything towards the repairs ; and, therefore, that if the plaintiffs or their vendors, ever had the right to use water from the well, they have forfeited the same by non-use and failure to contribute to the repairing, preserving and keeping in good order of the well, as stipulated : And he denies that Mark L. Spotts is the owner of the lot on which the well is located : And he finally denies every allegation in the bill not expressly admitted or conceded. The answer was sworn to.

The plaintiffs replied generally.

In the transcript of the record, as certified by the clerk, are copies of a deed, dated in 1839, from Calvin P. Hogshead to Jas. Nevins : A deed, dated in 1843, from Jas. Points, reciting that at a District Court of the United States for the Western District of Virginia, in October, 1842, upon the petition of Nevins, by a decree of the Court, he was declared a bankrupt, and it was ordered that Points, the assignee, should sell the interest of Nevins in the real estate, and report his proceedings to the court; and that in December, 1842, he did sell the estate, and Henry Erskine and Mason Mathews became the purchasers ; and purporting to convey the estate to Erskine and Mathews : A deed, dated in 1846, from them to Thomas A. Henning : A deed, dated in 1854, from him to George Lewis : A deed, dated in 1856, between a number of persons—among them Uriah N.

61

1874.
January Term.

Warren
and wife
v.
Syme.

Warren and Mary Ann, his wife—reciting that George Lewis, in his lifetime, was seised of a number of tracts of land specified, and that he died leaving most of the parties to the deed—among them Mrs. Warren—his heirs; and, to the intent that partition should be made between them, declaring that they should, severally, hold their respective parts—that, as the others, Warren and his wife should have their part, as specified: A deed, dated in 1858, from Warren to William Page, trustee, to secure debts: And a deed, dated in 1866, from John Lipps and John T. Truslow to S. C. Beard, trustee for Mary Ann Warren and her heirs.

It seems, that in the deed from Hogshead to Nevins, the deed from Points to Erskine and Mathews, and, probably, in the deed from them to Henning, and in the assignment in the partition to Warren and his wife, the same lot, in whole or in part, is described—situated in the town of Lewisburg, on the northward side of the turnpike, eastward of a lot of Mrs. Spotts, and westward of a lot of Jacob Smith: But that in the deed from Warren to Page, mentioned, and in the deed from Lipps and Truslow to Beard, trustee for Mrs. Warren, a different lot is mentioned.

Depositions of a number of witnesses are filed, in which they testify as follows: Henning states that Warren's house stands, in part, on the lot bought by him from Erskine and Mathews: That they bought from Points, assignee in bankruptcy, of Nevins, who bought of Hogshead: Spotts states that the lot on which the well is located, originally belonged to Littlepage, and was conveyed by him to Keenan or Wilson, and by one of them to Charles A. Stuart, and by the executors of Mrs. Stuart, to the witness Spotts, without any reservation: That he has lived in full view of the well since 1859, and from that time till a few weeks since, there was always an open way of ingress and egress from the turnpike to the well, across which there was no fence: That he presumes the taxes on the lot were paid by those

under whom he claims, previous to the purchase, and since that time, he has paid them: And William H. Syme states, that he purchased and took possession of the house and lot now in possession of his son S. A. M. Syme, the defendant, in the year 1840, and continued its owner and occupant 'till the past year, when he sold it to his son; except that for a short time during the war it was occupied by a tenant: That when he took possession of the lot and well as appurtenant to it, the well was in a waste condition and unfit for use, and apparently had been in that condition for some time: That, at his own expense, he had it cleaned out, fitted up and repaired; and from that time till he left the property, last year, it was kept in repair by himself and his son, and he, witness, himself or by his tenants, continued to use it, uninterruptedly, as his own exclusive property; though it afforded him pleasure, when the water was sufficient, to permit the neighbors to get water there; but, as a matter of right, he does not remember that the privilege to use the water was claimed by any one, and particularly by the plaintiffs: That, during the period of twenty-eight years, Mrs. Leonard, Mr. Jacob Smith, who owned the lots now occupied by the plaintiff Warren, and Mr. James H. Nesmith and Doctor Hugh Wilson, who occupied the property now owned by Spotts, all voluntarily relinquished any right they might be supposed to have to the well in controversy: That the witness claimed the well by reason of his keeping it in repair during the period he owned the property, having had the exclusive use and occupancy during that period; and not by virtue of the contract: That the plaintiff Warren was in the habit of getting water from Mr. Nesmith's well; that when excluded from that, and not till then, he endeavored with or without permission, to get water from the well in controversy, but never claiming the right to get it: That during this time witness frequently locked the well, and his right to do so was never questioned by the plaintiff Warren or any one else; that he

thinks he first locked it about three years ago: That during his occupancy the well was never fenced up: That he did not own the land on which it is situated: That two of the parties who relinquished the right to it, had wells of their own: That the relinquishment was voluntary: That the witness claimed the property on the land, the well, and the entrance to it, by reason of exclusive use and occupancy for twenty-eight years.

The cause came on to be heard on the bill, answer of some of the defendants, replication, service of summons on other defendants, exhibits, and depositions, and was argued by counsel: Whereupon, it was adjudged, ordered and decreed, that the defendant Syme be required to remove the obstructions to the well, so as to afford to the plaintiffs and their families direct and convenient access to it, in the same way that they enjoyed it before the obstruction was interposed by the defendant, or in some way equally convenient and direct; and that the plaintiffs should so have convenient and uninterrupted access to the water at all times, without let or hindrance, unless otherwise ordered by the court: And if the obstruction should not be so removed, the sheriff of the county, upon the application of the plaintiffs, should remove the obstruction and afford such access, at the cost of the defendant Syme, and should summon any force that might be necessary to enable him to execute the decree; and the injunction before awarded should be continued: And, that an account should be taken by a special commissioner, to ascertain and report the amount of expense incurred by Syme and his vendor, or those claiming under him, in keeping the well in repair and fit for use, and the amount paid by the plaintiffs; with any other matters deemed pertinent by himself or required by either of the parties.

Before the commissioner, Dickson, Spotts and Johnson were examined as witnesses, and testified that they did not use the water from the well, and had no interest in the suit: Other witnesses testified that William H.

Syme repaired the well. Accordingly, it was reported, by the commissioner, that from 1840 to 1868, William H. Syme kept the well in repair, at an aggregate expense, which, with interest, amounts to $262.92. The plaintiffs excepted to the report, because, as they stated, the defendant never made any charge against the plaintiffs, or any owners of the well; and, in a suit to restrain the defendant from obstructing the plaintiff from the use of the well, the court ought not to adjust matters which had nothing to do with the subject.

In April, 1871, the cause came on again to be heard upon the papers before read, and report of the Commissioner, and was argued by counsel; on consideration whereof, it was decreed, that the bill be dismissed, and that the defendant Syme recover against the plaintiffs his costs.

At the January term of this court in 1873, an appeal was allowed, and bond given.

It is alleged in the bill, substantially, though not at all formally, that the right to take water from the well was appurtenant to the Hogshead lot, and that the plaintiff Mrs. Warren owned the lot.

The agreement made by Littlepage with Hogshead, Rapp and others, respectively, is not in form a grant of the right to take water from the well, but it is a deed, by which a previous agreement was recited, and the owner of the lot on which the well is situated bound himself, his heirs and assigns, that the other parties, their heirs and assigns, should forever have access to the well, to have and take, at all times, water from it, when they might see fit: And the parties agreed that each should pay an equal part of the expense of repairing the well: And, in the superadded paragraph, it is recognized that each of the parties, by operation of the deed, took an interest that he might dispose of, subject to the qualification prescribed. The deed does not indicate that the parties contemplated any further assurance. I think the deed

was in effect a present grant of the right to use the water.

There is no express declaration in the deed, that the right granted shall pertain to the lots owned, severally, by Hogshead and others, now claimed by the plaintiffs and others, or to any other lots or lands : But, assuming for the purpose of construction, that the lot owned by Hogshead at the time of the contract between Littlepage and him and others, is the same now claimed by the plaintiffs ; there is evidence tending to prove that the well is so near to the lots mentioned that it might, by the occupants of these lots, be conveniently used ; while it would probably be of little if any value to any other person. With reference to these facts, if true, I think the provision that neither of the parties taking the easement should dispose of it, unless at the same time he should dispose of the property which he owned, with his right to use the well, by implication, annexed the servitude to the respective lots, as an easement appurtenant to each.

But it is argued by counsel that the deed is not in itself certain as to the lot upon which the servitude was imposed, or those to which it was annexed; and that therefore the recordation is ineffectual, and the deed is void as to Syme. And the case of *Mundy v. Vawter*, and the other cases considered with it as one case, (3 Gratt., 518) is relied on as authority for the objection.

The deed describes the well as on the lot of Littlepage, south of the turnpike, east of the lot belonging to Samuel B. Keenan, adjoining his lot. It would seem probable that there would be no difficulty in finding the lot described. And it would naturally occur to any one that the servitude was created and intended to be used in connection with adjacent lots. The deed itself recognizes that Hogshead and the other parties owned the lot with which the water was to be used, and, as has been before observed, the evidence in the case indicates their proximity to the well. Syme or any one

else, about to purchase from Littlepage, had access to the deed books as well as other ordinary fields of information, from which to ascertain the creation of the servitude, the identity of the lot on which it was imposed, and the lots to which it was made to pertain. A subsequent purchaser might refer, not only to the deeds or record of the deeds for these lots, and the objects to which they related, but to the deeds and objects indicating the location and limits of other lots that determined or tended to determine the location and limits of those in question. The index to the deed books afforded the ordinary clue to the investigation.

Intrinsic certainty in a deed relative to specific property is simply impossible. The description can be made certain only by proof or recognition of the identity of the subjects to which it refers, or other objects or things that, more or less directly and distinctly, indicate and determine it. And, in the application of deeds and other documents to lands and lots, extensive latitude is allowed for the discovery and proof, not only of visible monuments or objects mentioned, but of mathematical lines of other lands and lots, and various classes of facts to which the description or suggestions in the deed may apply.

As, in this case, the deed of grant was sufficiently certain, and properly admitted to record, it was effectual to create and dispose of the right, as to all persons.

The certainty of a deed is determined by the principles of the common law. The recordation is regulated by the statutes alone.

By the act of the General Assembly, on the subject, passed in 1705, (3 Hen. St. p. 318–19,) it was declared that no lands, tenements or other hereditaments should pass, whereby an estate in fee or for life should take effect in any person, unless the same should be made by writing, indented, sealed, and recorded as and within the time specified.

By the act passed in 1734, (4 Hen. St. p. 398–99,) it was provided, that all bargains, sales and other conveyances of any lands, tenements and hereditaments, for

passing an estate of freehold or inheritance, or for a term of years, should be void as to all creditors and subsequent purchasers, unless they should be acknowledged or proved and recorded according to the directions of the act.

By the act of 1785, which took effect in 1787, (12 Hen. St. p. 154,) it was provided, that no estate of inheritance or freehold, or for a term of more than five years, in lands or tenements, should be conveyed from one to another, unless the conveyance should be declared by writing, sealed and delivered; nor should such conveyance be good against a purchaser for valuable consideration, not having notice thereof, or any creditor, unless the writing should be acknowledged or proved and lodged, as prescribed, within the period prescribed.

At the revisal in 1819, (1 R. C. p 361, ch. 99, s. 1,) this provision was re-enacted:

And the provision enacted in 1734, already recited, was re-enacted with slight modifications, (p. 362, s. 4,) so as to provide, that all bargains, sales and other conveyances of any lands, tenements or hereditaments, made for passing any estate of freehold or inheritance, or for a term of years, should be void as to all creditors and subsequent purchasers for valuable consideration without notice, unless they should be acknowledged or proved, and lodged with the clerk to be recorded, according to the directions of the act; but that such deeds, as between the parties and their heirs, and as to all subsequent purchasers with notice thereof, or without valuable consideration, should, nevertheless, be valid and binding:

And, by another section, (p. 364, s. 12,) then first enacted, it was declared, that every conveyance, covenant, agreement and other deed, in the act mentioned, (except deeds of trust and mortgages,) which should be acknowledged, proved or certified according to law, and delivered to the clerk of the proper court to be recorded, within eight months after the sealing and delivery,

should be valid as to all persons, from the time of such scaling and delivery.

Under the law before the year 1819, it was plain, that, when the deed was recorded it was as valid and effectual as to all persons, as if there had been no legislation requiring recordation. But, if before that time there had been doubt on the subject, by the provision last recited, the validity of the deed, when recorded, was declared in language so clear that explanation would tend rather to obscure than to illustrate the subject.

Whenever the holder of the legal title to land made a deed for the conveyance of an estate, or the creation of a servitude or easement upon it, that was valid and effectual as to the alienor, the deed, when duly admitted to record, became alike valid and effectual to pass the estate or create the servitude or easement, as to any subsequent purchaser from him for valuable consideration without notice, and as to all other persons: Though, according to the more prevalent opinion, if the owner of a mere equitable right, separated from the legal estate, made a deed for the land, without warranty, to one person, and afterwards obtained the legal title and made another deed for it, to another person, for a valuable consideration without actual notice, notwithstanding the deed was recorded, this was not, by construction, such notice as to affect the conscience of a subsequent purchaser for valuable consideration—and would not prevent the purchase of the legal estate from extinguishing the equitable right unknown to the subsequent purchaser.

The case of *Mundy v. Vawter*, with the other cases decided with it, is voluminous, and the facts involved are complicated. The facts, however, referred to in that part of the opinion of the court supposed by counsel to be material in this case, are these:

While the law of primogeniture prevailed, George Christian, having the legal, as well as the equitable estate, in a tract of two hundred and fifty-three acres of land, an-

62

1874.
January Term.

Warren
and wife
v.
Syme.

other of two hundred and fifty acres, and another of four hundred acres, and the mere equitable right to a tract of one thousand and thirty-six acres, died intestate, and the whole descended to James Christian his oldest son. He and Charles Christian, his brother, and Elizabeth Christian and Sallie Christian, his sisters, supposing they all inherited the estate of their father equally, jointly obtained the legal title to the larger tract. In 1805, James Christian conveyed to Stephen Watts and James Murphy, trustees, all his estate real and personal—without specification of the tracts of which it consisted—that out of the rents, issues and profits, they might pay his debts and maintain and support his wife, and provide for the support and education of his children during his life, and at his death divide and convey the estate with the profits, one-third to his wife and the residue to his children. The deed was admitted to record. In 1807, James Christian, and Charles Christian, and James Murphy who had married Elizabeth Christian, and she, and William Horsley who had married Sally Christian, and she, and Watts and Murphy the trustees—though the latter had no authority to sell—made a deed of conveyance to James Dillard, in consideration of $1,314, which was paid. During this transaction, neither James Christian, nor Watts and Murphy, the trustees for the beneficiaries in the deed made in 1805, claimed more than an undivided fourth of the land, and Dillard had no notice of the equitable right in the beneficiaries to more than such interest. On the contrary, James Christian and the trustees claimed but a joint interest with Charles Christian; and they and Mr. and Mrs. Murphy and Mr. and Mrs. Horsley made the sale jointly; and neither James Christian nor the trustees objected to Dillard's paying three-fourths of the purchase money to Charles Christian and to Mr. and Mrs. Murphy and Mr. and Mrs. Horsley, in equal proportions, —which he did; so that from the conduct of James Christian and the trustees themselves, Dillard had good

1874.
January Term.

Warren
and wife
v.
Syme.

reason to believe—and as the court held—did believe, that the interest of James Christian at the date of the deed did not in any respect extend to the entire estate, exclusive of the title of the other parties to three-fourths of the land—but that it extended only to one-fourth.

Accordingly, the court held, that only to the extent of the undivided fourth part of the land, the legal title to which, by the deed executed in 1805 passed from James Christian to Watts and Murphy the trustees, for the benefit of the parties provided for, Dillard was a purchaser with notice of the right of the beneficiaries: But that, as to the three-fourths of the land the title to which passed from Charles Christian and Mr. and Mrs Murphy in her right, and Mr. and Mrs. Horsley in her right, to Dillard, he was a purchaser for valuable consideration, and had no notice of the equitable right of James Christian; and that notwithstanding such right, on the familiar principle of equity applicable to the subject, Dillard took the complete legal title, discharged of the latent right. The deed from James Christian to Watts and Murphy, trustees for others, though for all Christian's estate, without specification of the parts, so far as the deed passed the legal title from each of the co-tenants to the purchaser, was valid against the grantors and all other persons; but, according to the decision, was not notice to the subsequent purchaser of the equitable right in one party, separated from the legal title vested in another party which passed from him to the purchaser.

A person who would purchase a tract of land or a lot from another, naturally ascertains, from the record or otherwise, or assumes, that the party from whom he would purchase, has title to the land; and seeks to ascertain whether he has disposed of the title, or retains it. When the owner has made a deed, which is recorded, if the subsequent purchaser fails to examine the deed books, however special the description of the property may be, the record affords him no information. If, however, he does examine the books, the same search

will lead to a deed which merely mentions all the alienor's estate, that would lead to one which specially describes the property in question; and upon inspection of the deed containing only such general description, it would be as clearly and simply manifest that the holder of the specific property had conveyed it, as if it had been particularly described.

Though what I have stated is the extent of the actual decision in *Mundy v. Vawter*, and the other cases considered with it, as far as it relates to this subject, the court in that case, says:

"The court is of opinion that the deed of the 17th of June 1805, executed by the said James Christian to Stephen Watts and James Murphy, conveying to them, as trustees, for the purposes therein mentioned, 'all the estate both real and personal, to which the said James was in any manner entitled at law or in equity,' notwithstanding its want of designation and description of the lands of said James intended to be conveyed, was good and valid between the parties, and embraced the rights of said James in the tract of one thousand and thirty-six acres, and the three adjoining tracts aforesaid, acquired by descent, from the said George Christian his father.

"But the court is further of the opinion, that the registry of the deed just mentioned was not, because of the want of designation and description of the lands intended to be conveyed, notice in point of law to a subsequent purchaser from the grantor, of the existence of said deed; nor would notice in point of fact of such existence and contents affect such purchaser, unless he had further notice that the land purchased by him was embraced by the provisions of said deed; and the proof of such notice, whether direct and positive, or circumstantial and presumptive, must be such as to affect the conscience of the purchaser, and is not sufficient if it merely puts him upon inquiry, but must be so strong and clear as to fix upon him the imputation of *mala fides*."

I have thought and reflected long and carefully on this subject; and though, with my sincere confidence in their wisdom and earnestness, I hesitate to attribute to the eminent judges who decided that case, either error of judgment or negligence in expression, I am, nevertheless, constrained' to declare my irresistible conviction, that, beyond the principle involved in that case—which is not controverted—the latter paragraph, just quoted, is not law.

In deeds for all classes of property, descriptions of the most general character, that, by reference to existing facts may be made certain, prevail extensively. Under the plain language of the statute, and the uniform opinion of jurists—as far as I am informed—(except that of the judges who decided the case just mentioned, as indicated by the passage quoted,) such deeds have been employed, and, when recorded, have been treated as valid, and have been held to be effectual to pass the legal estate vested in the alienor, against all persons. And, with undoubting confidence in their validity and efficacy, titles have been acquired, and are held and deemed secure. Now to hold and declare that such deeds are void as to creditors and subsequent purchasers for value without notice, would disturb the quiet and destroy the security of titles and rights, to an extent beyond the scope of foresight: And, especially, to hold such deeds conveying real estate to trustees to secure debts, though recorded, nevertheless void as to other creditors or subsequent purchasers, (whether the trustees have sold and others have purchased and paid for the estates or not,) would subvert the efficacy of recorded deeds, with most disastrous results.

But the defendant Syme does not allege that he or Spotts, or any other person, purchased from Littlepage, mediately or immediately, for a valuable consideration, without notice of the creation and annexation of the easement;—as he should do, in some form, if he would rely on such fact.

Though the copies of the deeds from Hogshead to Nevins, from Points to Erskine and Mathews, from them to Henning, and from him to Lewis, and the deed of partition between other persons and the plaintiffs, are not specified in the bill or order book as exhibits, and—as far as appears here—were not endorsed as such, they are in the transcript of the record, certified by the clerk of the circuit court, and must be regarded as exhibits recited in the decree, as read on the hearing. The clerk, under the supervision of the court, must ascertain the papers filed in the case or referred to in the order book, as a part of the record : Though when the papers are identified, whether they may be considered as properly a part of the record, the court decides.

But there is no sufficient evidence to prove the identity of the lot owned by Hogshead at the time of the grant of the easement, with the lot mentioned in the deed : And there is no evidence competent to be used against the defendants that Nevins was, by the United States District Court, declared to be a bankrupt; that Points was assignee; or that he was by the court ordered to sell Nevins' property. Unquestionably, the mere recital, by Points, that there were matters of record that conferred on and vested in him title and power to sell, is not proof of such fact, against a person claiming to have right otherwise than through or under him : And there is no evidence competent against the defendants, that Lewis died, or that the plaintiff, Mrs. Warren, or either of the other parties to the partition, was his heir.

The copies of the deeds filed, then, did not prove that the title to the lot owned by Hogshead, passed from him to the plaintiffs.

In connection with the deeds, the testimony of Henning, who speaks of Points as assignee in bankruptcy of Nevins, and states that he owned the lot, to some extent indicates that the title of Nevins passed by the deed from Points to Erskine and Mathews : And no exception to the testimony appears. But, in a case such as this, and

1874.
January Term.

Warren
and wife
v.
Syme.

generally, parol evidence is not competent to prove the contents or effect of a deed; and the mere failure to object to such testimony when offered, or except to it afterwards, does not make it adequate to prove such fact.

Though the testimony of the same witness affirms that the house occupied by Warren is in part on the same lot, it does not assert or imply that the title passed from Henning to him or his wife.

The defendant Syme is not subject to any privity with the plaintiffs, or in any manner estopped to question their right. He denies that the plaintiffs had any title to the lot they occupy, and they prove none. They can have no relief in this case.

But, as the plaintiffs seem to have supposed the evidence adduced, complete to prove that the title to the lot passed from Hogshead mediately to them, and, upon that hypothesis, the pleading and evidence evolve several questions deemed material to the rights of the parties, it may not be improper to consider these briefly.

In each of the deeds from Hogshead to Nevins, from Erskine and Mathews to Henning, and from him to Lewis, there is express reference to "appurtenances;" but, in the deed from Points to Erskine and Mathews, there is no mention of the right to use the well, or of any appurtenance to the lot.

If, however, Nevins was declared a bankrupt and Points was assignee, then, by operation of law, all the property of the former, of every nature, was vested in the latter, to sell for the benefit of creditors. But it was a condition to which the easement was subject, that Hogshead should not sell or dispose of it separately from the lot. Such a condition, in effect merely annexing the servitude upon one estate to another estate, was not such a restraint on alienation as to be objectionable. And the easement remained subject to this qualification, after it was vested in the assignee in bankruptcy: So that, while it was his duty to sell the easement, he could not

dispose of that separately from the lot. Under these circumstances, the conveyance of the lot by the assignee in bankruptcy would imply the transfer of the easement appurtenant, without an express grant or any mention of the appurtenance—Notwithstanding it does not appear that the use of the water was necessary to the enjoyment of the lot, or that at the time of the conveyance the easement was, in fact, used with the lot.

Then, if upon the death of Lewis, and the partition of his estate, the plaintiffs acquired the title to the lot, they acquired, with it, the right to use the well.

There is no evidence that the plaintiffs ever did anything indicating a relinquishment or abandonment of the right to use the well with the lot, except, that, from the time when they acquired the right, they did not use it till about two years before the institution of the suit;—when they endeavored to get water from the well, though not claiming the right to do so ; and, afterwards, Syme locked the well, and his right to do so was not questioned. But the recital in the deed of partition, indicates that Lewis was living in 1854, and the title to the Hogshead lot or any interest in it, could not have descended on Mrs. Warren till afterwards. From that time till the institution of the suit, she was a married woman :—Though perhaps her husband so acquired her estate and its appurtenances for their joint lives, that it might be affected for that period, without regard to her disability.

There is no evidence that Littlepage or any person claiming the lot on which the well is situated, or any person deriving title from him, ever used or claimed the right to use the well, adversely to the right of the plaintiffs.

Though, in the deed between Littlepage of the one part and Hogshead and others of the other part, it is recited that Littlepage agreed, that if they would sink the well, they and their heirs and assigns might have access to it, as also Littlepage and his heirs and assigns ; the latter

1874.
January Term.

Warren
and wife
v.
Syme.

clause seems to be added to preclude any presumption that might arise, that the use of the well by the other parties should be exclusive of the like use by Littlepage or his heirs or assigns, who should own the corporeal estate in the well. But this clause did not create any new right in Littlepage or any purchaser from him, that otherwise he would not have had, or annex any servitude on the well, or attach any right to the use of it, to any other part of the lot.

There is no evidence that Littlepage ever used the well in connection with that part of the lot which, it is said, he sold and Syme purchased; or that the right to use the well was necessary to the enjoyment of that part; or, that such servitude ever became appurtenant to any part of the lot, or in any way passed from Littlepage to either Syme.

The elder Syme, the witness, says, that he purchased and took possession of the lot now in possession of his son, the defendant; that he did not own the lot on which the well is situated, but took possession of the well as appurtenant to the other lot; and that he had the well repaired at his own expense, and used it without interruption, as his exclusive property, for many years. Upon elementary principles and authority, the incorporeal right to use the well, alone—not the estate in the land—could be appurtenant to the lot claimed by Syme. And he may have so used the well, with the acquiescence of the owner, as to establish a right to use it as such easement. But there is no sufficient evidence that he did any act exclusive of the plaintiffs from the use of the water in common with himself, or any act demonstrative of an adverse claim known to the plaintiffs, or which, with ordinary attention, they would have learned, till a short time before the institution of the suit: Or that, upon any acts or acquiescence of the plaintiffs unequivocally significant of abandonment, the defendant Syme purchased the lot.

63

When, by direct proof of a grant, or other sufficient evidence, an easement has been conclusively established, there may be proof of an act or declaration of the owner indicative of renunciation or abandonment, followed by non-use for a period long enough to bar an action of ejectment to recover the possession of the land; which, when the defendant is not under disability, is ten years, and when he or she is under disability, is twenty years: Or proof of a claim by the owner of the corporeal estate, or another in his stead, known to the owner of the easement, or evinced by acts that, in the exercise of ordinary vigilance he would have learned, followed by non-use by the owner, for such period: Or an act or declaration by the owner of the easement, clearly demonstrative of actual abandonment, that in fact promotes some action on the part of another, by which, if the easement were not held to be determined, the latter would be seriously injured: And such proof may conclude the extinguishment of the easement. But certainly, nothing less than one or the other of these combinations of facts, will have such effect. The limited right of a husband in the inheritance of his wife, may, by such acts and declarations, be affected for the time of its duration, as the right of other owners would be: But whether the right of a married woman, would, by such acts and non-use for twenty years, be extinguished, I do not now pause to consider.

The plaintiffs, in the bill, allege that the defendant Syme has recently locked up the well, and forbidden them to use the water. The defendant Syme, in his answer, does not admit or concede this, in whole or in part; and he denies every allegation of the bill not expressly admitted or conceded. There is no proof that this or any other defendant at any time either locked the well or forbade the plaintiffs to use it, or in any manner prevented their enjoyment of the water it furnished.

The provision adopted in the Code of this state, (Code

p. 604, Ch. 125, s. 36,) that every material allegation of a bill not controverted by the answer, shall, for the purposes of the suit, be taken as true, does not require a more special denial than was sufficient before its adoption. But, as formerly, the plaintiff, upon proper allegations, may interrogate the defendant, and he will be required to answer each proper interrogatory. Under other provisions of the statute, when the plaintiff swears to his bill the defendant is justly required to swear to his answer, in order that the plaintiff who so verifies his case shall not be put to the trouble and expense of further proof, unless the defendant will, in like manner, verify his defense : But it is provided—as I think wisely— that neither the bill nor the answer, whether both or neither be so verified, shall be read as evidence upon the final hearing of the cause. If the defendant does not answer properly, the plaintiff may except to the answer. When, however, he fails to do so, a general denial of the allegations of the bill, or any of them, will make it necessary that the plaintiff shall prove the facts alleged and so controverted, that are in their nature affirmative.

The decree of the circuit court rendered in December 1869, directed that the plaintiff should have uninterrupted access to the water of the well, unless and until otherwise ordered by the court; that the injunction before awarded,—which was only until the rights of the complainants could be considered and adjudicated—should be continued ; and that an account should be taken by a commissioner named, to ascertain the amount of expense incurred by Syme the father, from whom Syme the defendant claimed, and by the latter, in keeping the well in repair, and the amount paid by the plaintiffs ; and that the account when taken should be reported. The rights of the parties were not finally adjudicated ; the injunction was not perpetuated ; the decree directed an account to be taken and reported ; while it did not determine the question of costs or direct their payment.

The decree was merely interlocutory. .

The final decree rendered in 1871, from which the appeal was taken, properly, in effect terminated the operation of the interlocutory decree and dissolved the injunction.

The plaintiffs, in the bill, allege nothing that is sufficient cause to make Dickson, Johnson, Spotts and Mrs. Leonard parties; and do not seek relief or prove right to it against any of them. Though the plaintiffs named them as defendants and ask that they should be required to answer the bill, they did not appear as parties. The plaintiffs took no decree *nisi* or other order against them; but brought the case to a hearing, or acquiesced in the hearing; when the bill was dismissed generally. If it really appeared who severally have the right to enjoy the well in common, the plaintiffs could not object that the case was not matured as to the parties mentioned, or that the court did not provide for the payment to Syme of any part of the expense of repairing the well: And the plaintiffs, only, appeal and no other party asks a reversal. ·

As the plaintiffs failed to prove that they had the title which they claimed to have acquired mediately from Hogshead, or the right to use water from the well annexed to it, or any right whatever to use the well; or, if they had such right, failed to prove that the defendant Syme, or any party to the suit obstructed it; the decree dismissing the bill was unquestionably right, and must be affirmed, with damages and costs to the defendant against the plaintiffs.

The other Judges concurred.

DECREE AFFIRMED.