SEEGER REFRIGERATOR CO. v. AMERICAN CAR & FOUNDRY CO.

(Circuit Court, D. New Jersey. June 21, 1909.)

1. PATENTS (§ 234*)—INFRINGEMENT—CHANGE IN FORM OF PARTS.

Infringement is shown where the alleged infringing device operates on the same principle as that of the patent, and accomplishes the same result in substantially the same way by equivalent means; the only difference being in the form or proportions of the parts.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 370; Dec. Dig. § 234.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—REFRIGERATOR.

The Quinn patent, No. 539,009, for a combined refrigerator and freezer, the important feature of which is a series of ports in the partition between the ice bunker and food chamber, which by siphonic action causes a continuous circulation of air in the refrigerator, was not anticipated,

and discloses invention; nor is it limited by a change in the wording of the claims made at the suggestion of the examiner in the Patent Office the effect of which was merely to more specifically define the invention; also *held* infringed by the refrigerator of the Ames patent, No. 625,309, which adopted the principle of the Quinn invention, with only some changes in form of the ventilating ports.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

**8.** CORPORATIONS (§ 428*)—EQUITABLE ESTOPPEL—NOTICE TO CORPORATION.

Notice of matters to create an estoppel may be imputed to a corporation where the facts were known to all of the corporators, but not because they were known to some of them only.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1751; Dec. Dig. § 428.*]

In Equity.   On final hearing.

Wetmore & Jenner, Edmund Wetmore, and Oscar W. Jeffery, for complainant.

Betts, Sheffield, Bentley & Betts, Samuel R. Betts, and Paul Bakewell, for defendant.

CROSS, District Judge.   The patent involved in this case was issued May 7, 1895, to Gilbert T. Quinn, assignor, to the G. F. Quinn Regrigerator Company.   It is for a combined refrigerator and freezer, and is numbered 539,009.   The inventor, describing his invention says:

"My invention relates to improvements in a combined refrigerator and freezer, and more particularly to certain principles of construction which tend to increase the refrigerating and freezing power and to regulate the degree of temperature.

"It consists in a containing case constructed with suitable air spaces and nonconducting walls and arranged and constructed interiorly as follows:  Between the ice bunker and the refrigerating or freezing room is a partition formed by a series of angular sections arranged one above the other and forming between each two sections an open space leading from the refrigerating or freezing room into the ice bunker, the apex of each section extending above the lowest point of the section immediately above it, thus forming between each two sections an inverted V-shaped open space, the object of which will be hereinafter more fully set forth.   Between the bottom of the ice bunker and the bottom of the refrigerator case is a series of ice supporting bars placed at short distances apart, and extending from the lower section of said partition over said ice bars, and thence to the wall of the ice bunker, is a wire netting to hold small particles of ice and salt.   Underneath the ice bunker are an inclined drip pan and a trap leading down through the refrigerating case, and a partition which prevents the water from passing through into the refrigerating or freezing room.   At the top of the refrigerating room is a ceiling inclined downwardly away from the ice bunker.   The walls of the ice bunker have a shield with inclined openings therein leading to a cold air space between the partition and refrigerator case."

The three claims involved are Nos. 1, 3, and 7, as follows:

"1. In a combined refrigerator and freezer, a suitable outside case, a refrigerating room and an ice bunker therein separated by a partition, inverted V-shaped ports in said partition leading from the refrigerating or freezing room into said ice bunker and ports leading through the bottom of said ice bunker and thence into the bottom of the refrigerating room, substantially as and for the purposes set forth."

"3. In a combined refrigerator and freezer, a suitable outside case, a refrigerating or freezing room and ice bunker therein separated from each other by a partition, inverted V-shaped ports in said partition leading from the re-

frigerating or freezing room into said ice bunker, the bottom of said ice bunker being perforated and in communication with the refrigerating or freezing room, the floor under said ice bunker inclining downwardly toward the refrigerating or freezing room, substantially as and for the purposes set forth."

"7. In a combined refrigerator and freezer, a suitable outside case, a refrigerating or freezing room and an ice bunker contained therein separated from each other by a partition formed by a series of angular sections placed one above the other and at some distance apart, forming inverted V-shaped ports leading from the refrigerating or freezing room into said ice bunker, the apex of one section being higher than the lower extremities of the section next above it, the bottom of said ice bunker being perforated and in communication with the refrigerating or freezing room, substantially as and for the purposes set forth."

Some question has been made in reference to the complainant's title to the patent in suit. It is sufficient to say, however, upon this point, that upon examination I find that after numerous mesne assignments the title finally vested in the complainant. The important feature of the invention is found in the form of the partition in the refrigerator between the ice bunker and the food chamber, which, as set forth in the specifications and claims, contains a series of inverted V-shaped ports, by means of which a continuous circulation of air in the refrigerator is provided. The colder air in the ice bunker, proceeding downwardly, passes through the open bottom thereof, and thence across and under the partition into the lower part of the provision chamber, whence it ascends through the provision chamber, but at the same time moving laterally toward the ports in the partition into the ascending legs of which it enters, and, passing through them and also the descending legs, re-enters the ice chamber. The circulation of the air thus maintained causes it to be frequently subjected to the cooling effects of the ice, whereby its temperature is not only lowered, but the vapors and volatile matters carried into the air from the food are separated therefrom and precipitated upon the ice before the air is returned to the provision chamber. It is claimed on behalf of the complainant that the inverted V-shaped ports in the partition act as air siphons, and that, as the air in the legs of the siphon which extend downwardly into the ice bunker becomes cold and is precipitated to the bottom thereof, it is necessarily and instantly replaced by the warmer air from the provision chamber which is sucked through the legs of the siphon, extending upwardly from that chamber, and thus a free, constant, and rapid circulation is provided. It is the adaptation of these ports to convey upwardly on the one side the warmer and ascending currents of air, and to facilitate on the other side the drop of the cooler and descending currents of air, without unnecessary delay or friction, that constitutes one of the chief merits of the patent. Before leaving this point, it would be well to quote at length a passage from the testimony of the complainant's expert, in which, explaining the theory of refrigerating food products, and the action of the complainant's refrigerator in connection therewith, he says:

"As I understand the matter, perishable articles of food are best preserved by keeping the same in an atmosphere which has a suitable low temperature, and which does not contain an objectionable degree of humidity, or odors which the air can communicate to the articles to be preserved. If

the temperature is too high, the articles will decay or spoil. If the air is moist or humid, the same result follows, and, if the air contains odors foreign to the articles to be preserved, they are liable to be contaminated by absorbing such odors. In a refrigerator in which the described circulation of air is maintained the air passes upwardly through the provision chamber, and during that passage it absorbs from the articles contained in the chamber vapors, moisture, and odors. The air laden with these absorbed matters passes from the refrigerating chamber into the ice bunker, and is cooled by the refrigerating effect of the ice, and also parts with all condensable matters which it deposits upon the ice and the cold surfaces of the ice bunker. The water resulting from the melting ice takes up these condensation products and carries them off through the trapped discharge provided in the bottom of the refrigerator. The air in flowing down through the ice bunker in its path to the lower portion of the provision chamber is so cooled and at the same time dried and purified, and this dry, purified air then enters the lower portion of the provision chamber in a fit condition for again absorbing moisture, vapors, odors, and other volatile matters exhaled by the contents of the provision chamber. This circulating body of air which is confined in the refrigerator therefore is not only a cooling medium in its action upon the contents of the provision chamber, but also a vehicle for conveying the matters exhaled by the contents of the provision chamber over into the ice bunker, and causing the same to be condensed or precipitated in the ice bunker from which they are discharged from the refrigerator.

"An ordinary ice chest of the kind which are still in use and on sale and which comprises a box into which the ice and the articles to be preserved are placed from the top, which box is closed by a cover or lid, does not operate upon this principle, although so far as mere refrigerating effect is concerned a given amount of ice may produce in such an ice chest the same effect as in any other style of refrigerator. In such a chest the air would stratify, the strata ranging from the coldest at the bottom to the warmest at the top, and the air would be stagnant. In the Quinn refrigerator and in defendant's refrigerator the wall or partition separating the ice bunker from the provision chamber is provided with a series of superposed air ports or passages leading from the provision chamber to the ice bunker, and it follows from this that the flow of the air upwardly through the provision chamber cannot take place in a vertical direction, but must take place to greater or less extent in an oblique direction toward the receiving ends or mouths of these ports. Each of these ports produces a suction effect at its inlet end, and the suction at that point causes a flow of air particles in the vicinity of the end of the port toward the same. Whenever an air particle moves out of its position another air particle must take its place, and the movement is so transmitted from one particle to another, each moving particle making room for the next following particle. The suction of the numerous ports, one above the other, in the Quinn partition, therefore, causes a flow of air toward the partition throughout its extent, from the top to the bottom of the same, and the direction of this flow can neither be horizontal nor vertical because the tendency of the air to rise is modified by the suction action of the ports which tends to draw the rising air sidewise in the refrigerator toward the slat partition."

There is absolutely nothing in the prior art which shows this so-called siphonic system of ventilation and refrigeration, although it is true that similar ports or passages are found in patents in the nonanalogous art of house ventilation. None of these, however, was cited by the patent examiner against the patent in suit, and a cursory examination of them would seem to disclose sufficient reason for the omission. The ventilation of sleeping apartments and staterooms, of sheds for storing coal, and other like compartments are too remote to be considered in connection with the art under review. The defendant's expert admits that none of the patents cited directly anticipate the Quinn patent, but claims, nevertheless, that in view of what the prior patents dis-

close there was nothing new in siphon ports as arranged and combined in that patent; but, the closer the prior art is studied, the clearer will it appear that the patent in suit discloses an inventive advance over all that preceded it. Counsel for the defendant was understood to say upon the oral argument that there was little, if anything, of benefit or advantage in the form or arrangement of refrigerating ports, and that one kind was after all about as good as another. This argument, however, proves too much, and carried to a logical conclusion would not only nullify scores of patents, but completely wipe out an art which has long been thoroughly well recognized and established. Looking for a moment at the prior art, let us first consider the Player patent, No. 503,772, which, among others, was cited by the examiner against the allowance of the claim of the patent in suit. It disclosed a slatted partition composed of single slats inclined downwardly into the ice bunker, but omitted entirely the leg of the siphon ascending from the provision chamber; in other words, it had no siphonic appearance or effect. All that it showed was a series of slanting ports extending through the partition between the ice bunker and the provision chamber, arranged at an angle of about 45°; the upward end of each port being located on the provision side and the lower end on the ice side. Reynolds, No. 305,019, is the only other cited patent that will be specifically referred to. It discloses a solid partition with two openings therein, one above the other, which openings have inserted in them movable slats like those of a window blind. These movable slats could obviously be set in any desired position, but even then the one set of the slats would have to be turned upward and the other downward, and hence could not be united as are the legs of the siphon in the Quinn patent, and as they must be in order to have any siphonic effect. It is unnecessary, in view of the above admission of the defendant's expert, to consider in detail several other patents cited as anticipations. Moreover, the two just referred to were perhaps more than any of the others relied upon by the defendant at the argument as anticipations of the Quinn patent; but, however that may be, that patent in my judgment shows a distinct advance, not only over them, but over all of the other alleged anticipations. Again, it is urged on behalf of the defendant that, in view of the disclosures of the file wrapper of the Quinn patent, the claims of that patent are limited by certain amendments to the claims imposed in the Patent Office and accepted by the patentee. The claims as originally drawn characterized the ports as "angular" or "vertically angular." This characterization was objected to by the examiner as conflicting with the Player and other patents, which he cited. To obviate this objection, Quinn amended his claim by describing the ports as "inverted V-shaped." The Player patent disclosed, as has already been remarked, oblique or angular passages in the partition between the ice bunker and the provision chamber. It is plain, therefore, that the claims of the patent in suit so long as they contained the words "angular" and "vertically angular" might be held to conflict with refrigerator partitions, showing ports or passages of the Player design. Those passages were "angular" and in a sense "vertically angular." Notwithstanding this, it is apparent that Quinn in amending his claim did not limit his invention, but only defined it

more explicitly. The expression "inverted V-shaped ports" more clearly defined the siphonic principle of his invention than did the expression "angular." He was not called upon to do more than differentiate his invention from Player's and others of that class. So far from limiting or abandoning the siphonic principle therefore, he, by the use of the "inverted V" expression, gave it added emphasis. The examiner did not question his invention, but rather his characterization of it, and this was amended accordingly.

In substance, the reasons alleged by the defendant to show that it does not infringe the patent in suit are that the ports or passages adopted by it are not of an inverted V-shape, and that the leg of the siphon extending downwardly into the ice bunker is longer than that extending upwardly from the provision chamber. In these respects the defendant's device does differ from the complainant's. The defendant's refrigerators are manufactured under what is known as the Ames patent, No. 625,309, issued May 23, 1899. This patent has adopted the siphonic principle, which is expressly referred to in the specifications, as it was also in those of the Quinn patent. Ames says:

"As will be evident from the foregoing description, the ports which constitute the wall separating the food chamber and ice bunker are of siphon shape, with the short conduits extending downwardly into the food chamber and the long conduits extending downwardly into tthe ice bunker adjacent to the ice."

The question as to whether or not claim 1 of the Quinn patent is tied down to the inverted V-shaped port is of controlling importance. If it is not, and I do think it is, the defendant's device in my judgment unquestionably infringes it. In considering this question it should be noted that the obtuse angled ports shown on figure 1 of the printed copy of the patent little resemble the black-faced V-shaped ports appearing in the specifications and claims. In the drawing the angle shown in the ports is apparently from 50° to 60°, while in the specifications the inverted V design shows an angle of 20° or less. It is notorious that V's in type form are of various shapes and angles. Some may be found with arms of equal length, some with one arm longer than the other, and some, particularly in italics, with a rounded, instead of an angular, base. The amendments in the specifications and claims shown by the file wrapper were made, as they usually are, in script, and in some cases the V there appears in the true siphon shape. The above remarks are made merely to show that the patentee ought not to be held down to that particular form of V which a type setter happened to use in making a printed copy of the patent. It would be unfortunate, moreover, if the defendant by simply changing the shape of its port into that of a U, or other curved design, and lengthening or shortening one leg thereof, could appropriate the principle of the Quinn invention, and yet escape infringement. It is quite possible that it is better to have the top of the port curved than angular, but, be that as it may, it is entirely true of both that the air flows through the port in substantially the same way in obedience to the same law, and accomplishes the same result. The siphonic principle is common to both, and consequently whether the top of the port be curved or angular is not a matter of substance, but of degree. It is merely a mechanical change which does not alter the character or prin-

ciple of the invention, or relieve the defendant of the charge of infringment. As to the difference in the length of the legs of the siphon ports, that also would seem to be but a matter of degree and of little consequence. Quinn did not say that the legs of the ports of his device were to be of equal length, and it can only be inferred, if at all, from the use of the phrase "inverted V-shaped." It would well-nigh frustrate the purpose of the patent law if its provisions could be evaded by so inconsequential a modification of a patented device as that. At the most, such a change is merely an addition to or subtraction from one of the legs of the port of the complainant's patent. It is a matter of size or dimension only. As already stated, both the Quinn and the Ames patents do the same work in substantially the same way, and achieve the same result. The same principle is apparent in both, and is worked out on the same lines. When this situation is disclosed, infringement is disclosed. Machine Company v. Murphy, 97 U. S. 120, 125, 24 L. Ed. 935; Cantrell et al. v. Wallick, 117 U. S. 689, 695, 6 Sup. Ct. 970, 29 L. Ed. 1017. In the case of Winans v. Denmead, 15 How. 330, 342, 14 L. Ed. 717, Judge Curtis says:

"Where form and substance are inseparable. it is enough to look at the form only. Where they are separable, where the whole substance of the invention may be copied in a different form, it is the duty of courts and juries to look through the form for the substance of the invention—for that which entitled the inventor to his patent. and which the patent was designed to secure. Where that is found, there is an infringement; and it is not a defense that it is embodied in a form not described, and in terms claimed by the patentee. * * *

"The exclusive right to the thing patented is not secured if the public are at liberty to make substantial copies of it, varying its form or proportions. And therefore, the patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it. is in contemplation of law deemed to claim every form in which his invention may be copied, unless he manifests an intention to disclaim some of those forms."

It is elementary to say that the Ames patent may be an improvement upon the Quinn patent without that fact relieving the Ames patent from contribution to the other and earlier. Cantrell v. Wallick, supra; Columbia Wire Co. v. Kokomo Steel & Wire Co., 143 Fed. 116, 123, 74 C. C. A. 310, and cases cited. Notwithstanding the disclosures of the file wrapper of the Quinn patent, the complainant is entitled to a reasonable application of the doctrine of equivalents, and in my judgment even a comparatively restricted application of that doctrine shows that the defendant's device is an infringement. In this connection it is proper to refer to the fact that the White Enamel Refrigerator Company manufactured under the Ames patent the alleged infringing devices for the defendant herein, and is defending this suit. This company at one time complained to the Merchants' Dispatch Transportation Company, one of the largest customers of the complainant, that it was infringing the Ames patent by the use of refrigerator cars made in accordance with the Quinn patent. Mr. Bohn, the president of the White Enamel Refrigerator Company, in explanation testifies that the foregoing complaint was made because the refrigerators of the Merchants' Dispatch Company were constructed, as he understood, with one leg of the siphon longer than the other.

As a matter of fact, however, the evidence shows that the legs of the siphons in the refrigerator cars complained of were, if not exactly of equal length, very nearly so; it appearing that such variation in length, if any, existed in but a few instances, and did not at the utmost exceed three-eighths of an inch. It may be assumed that variations in length of so slight a character in a car refrigerator would hardly be discernible by the unaided eye. Whatever the fact, however, as to the existence of any discrepancy in the length of the legs of the siphons in the refrigerator cars in question, there is no suggestion that the ports in the partitions in the refrigerators therein were curved at the apex. On the contrary, it unquestionably appears that they were of the inverted V-shape, and that the complainant never made any refrigerators having ports other than of that type. The complaint of infringement made under the circumstances above detailed by the White Enamel Refrigerator Company therefore becomes significant. A defendant, and such that company really is, will not be permitted at the dictation of self-interest to assume inconsistent and contradictory positions. In view of its above-mentioned complaint, that company cannot urge with any great vigor or consistency that the Ames U-shaped ports are totally different from the Quinn inverted V-shaped ports.

Reference ought also to be made at this point to another matter as possibly revealing the origin and animus of the Ames patent. It is this: On August 27, 1897, the Quinn Refrigerator Company, the then owner of the patent in suit, assigned to Gebhard Bohn, George W. Bohn, John A. Seeger, and John H. Ames the right to manufacture refrigerators under the Quinn patent in several of the states. The contract was so drawn as to permit the assignees to surrender their rights and privileges thereunder almost at pleasure. As a matter of fact, the license was surrendered February 9, 1899, and it is worthy of remark that such surrender was made only about three months after the Ames patent was issued, the application for which was filed by Ames, one of the licensees, on December 23, 1897, within four months after the license was granted. It should also be remembered that the patent when issued was issued to Ames as assignor to Gebhard C. Bohn, who, with his father, Gebhard Bohn, also one of the licensees, on March 3, 1899, started the business of manufacturing refrigerators under the partnership name of the White Enamel Refrigerator Company. Furthermore, the above-named licensees were at the time their license was granted all directly interested in the Bohn Manufacturing Company, and upon the execution of the license that company immediately began the manufacture of refrigerators thereunder. The licensees had not up to that time ever manufactured refrigerators of any kind. Moreover, it appears that after the license was granted the Quinn Company in compliance with its terms sent sample refrigerators made under the patent in suit to the Bohn Company to aid and instruct it in the manufacture of like refrigerators. The Bohn Manufacturing Company, however, only constructed between 75 and 150 refrigerators under the license; but did make refrigerators of the kind subsequently covered by the Ames patent as early as the latter part of 1897, or just about the time Ames filed his application for a patent. Enough has been said to establish with some degree of probability, if not of certainty, the origin of the Ames

patent. But, if more were needed, there is testimony directly tending to show that that patent was conceived for the very purpose of escaping the payment of royalties under the Quinn patent. Again, Ames at the time the Quinn patent was cited against his application in effect admitted that his invention was but an improvement upon that patent. The evidence all tends to show that the Ames patent was conceived and the business of the White Enamel Refrigerator Company built up, in no inconsiderable degree, upon the foundation of the Quinn patent. Both the complainant and the White Enamel Refrigerator Company have, according to the evidence, established large and successful businesses in the manufacture and sale of refrigerators. Both patents have proved to be commercial successes, and if, as claimed, the Ames patent has proved the better, the fact remains that it is but an improvement upon the patent in suit, the leading principle of which it has adopted and used, and for which it should pay tribute. The defendant has set up the defenses of laches and equitable estoppel in bar of the complainant's relief. I have carefully considered them both. As to the question of laches, the evidence does not clearly show that the alleged infringement of the Quinn patent was brought home to the complainant and its predecessor in title as claimed by the defendant, and hence that defense is not sustained. As to the alleged equitable estoppel, there is nothing in the evidence which satisfies me that the complainant corporation, and its innocent stockholders, should be charged with knowledge or notice of the matters set up by way of estoppel. Some of the corporators may have had notice, but not all. Where all of the corporators of an incorporation have notice, such notice may be imputed to the corporation, and it was so held in Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 436, 12 Sup. Ct. 239, 245, 35 L. Ed. 1063, where the court said:

"Reference to the appendix to the acts of the Legislature of West Virginia of 1885 (pages 446, 447) shows the certificate of incorporation of the company, from which it appears that the agreement required under the statute in order to form a corporation was delivered to the Secretary of State of West Virginia on the 16th of January, 1885, on which day the company, as the Secretary certifies, became a corporation. The subscribers to the agreement were P. H. Rorer, I. A. Welch, N. L. Reynolds, A. W. Reynolds, and George W. Belcher; and the agreement states that these five corporators had subscribed the sum of $250, being one $50 share each, and had paid on the subscriptions the sum of $25. It is through these corporators that the company claims title and the record discloses that Welch was its president. Associated together to carry forward a common enterprise, the knowledge or actual notice of all these corporators and the president was the knowledge or notice of the company, and, if constructive notice bound them, it bound the company."

The case here presented is not within the principle thus declared, which could not, as it seems to me, be wisely broadened.

Upon the whole case, I have reached the conclusion that the defendant has infringed claims 1, 3, and 7 of the patent in suit. The usual decree will accordingly be entered in favor of the complainant, with costs.